UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| JENNY FORTENBERRY, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Cause No. 3:16CV648-PPS |
| NANCY BERRYHILL, Acting Commissioner of the Social Security Administration,[1] | ) ) ) ) |
| Defendant. | ) ) |

**OPINION AND ORDER**

Jenny Fortenberry appeals the Social Security Administration's final decision denying her application for disability benefits. That denial is in a written decision of an Administrative Law Judge, entered after a hearing at which Fortenberry appeared and testified.[2] [AR at 19-31; AR at 41-109.] At the time of the hearing in February 2015, Fortenberry was 50 years old. [AR at 28.] She was 46 on the date she alleges her disability began. [*Id*.] She did not graduate from high school, only attending school to 10th grade. [AR at 51.] Fortenberry had previously worked as a housecleaner, a cashier, and a waitress. [AR 52-58.] She had last worked in 2011, and claims that she became unable to work because of a disabling condition as of August 5, 2011. [AR at 60, 239.]

---

[1] On January 23, 2017, Nancy Berryhill became the Acting Commissioner of Social Security. Fed.R.Civ.P. 25(d) provides for Berryhill's automatic substitution in place of her predecessor, Carolyn Colvin.

[2] The administrative record [AR] is found in the court record at docket entry 10, and consists of 657 pages. I will cite to its pages according to the Social Security Administration's Bates stamp numbers rather than the court's Electronic Case Filing page number.

The ALJ found that Fortenberry has four severe impairments: degenerative disc disease, carpal tunnel syndrome, depression and anxiety. [AR at 22.] The ALJ also found that Fortenberry has the non-severe impairment of fibromyalgia. [*Id.*] The ALJ concluded that Fortenberry's severe impairments do not conclusively establish disability by meeting or medically equaling the severity of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. [AR at 22.] At the ALJ's hearing, Fortenberry conceded this. [AR at 45.]

The ALJ found that Fortenberry possessed the residual functional capacity to perform less than light work [AR at 24], and was actually still capable of performing her past relevant work as a housekeeper/cleaner [AR at 28]. In addition, based on the ALJ's findings as to Fortenberry's residual functional capacity, as well as her age, education and work experience, the ALJ concluded that Fortenberry can perform several other jobs at the light exertional level that exist in significant numbers in the national economy, and that Fortenberry is not disabled. [AR at 28-29.]

Fortenberry asks me to reverse the ALJ's decision or remand the case for further proceedings by the Social Security Administration. My role is not to determine from scratch whether or not Fortenberry is disabled and entitled to benefits. Instead, my review of the ALJ's findings is deferential, to determine whether the ALJ applied the correct legal standards and whether the decision is supported by substantial evidence. *Shideler v. Astrue,* 688 F.3d 306, 310 (7th Cir. 2012); *Castile v. Astrue*, 617 F.3d 923,926 (7th

Cir. 2010); *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). If substantial evidence supports the Commissioner's factual findings, they are conclusive. 42 U.S.C. §405(g).

What is "substantial evidence?" The term suggests a rigorous review is required. But it's helpful on occasion to remind ourselves just how low the Supreme Court has defined the standard of review. The Court has told us that while it is more than a "scintilla" of evidence, it's less than a preponderance of the evidence. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The review of an ALJ's findings is a light and deferential one. The ALJ should be affirmed if the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In making a substantial evidence determination, I must review the record as a whole, but I can't re-weigh the evidence or substitute my judgment for that of the ALJ. *Id*.

Fortenberry offers two specific challenges to the ALJ's decision. The first deals with how the ALJ evaluated the opinion evidence of Fortenberry's doctors. The second concerns how the ALJ evaluated Fortenberry's limitations and impairments, and whether they were adequately accounted for in the residual functional capacity analysis.

1. **Analysis of Medical Opinion Evidence**

Fortenberry argues that the ALJ failed to properly weigh medical opinion evidence. The ALJ decided to give little weight to the opinions of Fortenberry's treating physician, Dr. John Kelly, and the consultative examiner, Dr. Bharat Pithadia. But the ALJ chose to give considerable weight to the opinions of state agency consultants who did not examine Fortenberry and which were rendered longer ago and without benefit of much of the medical evidence in the record. Here's what the ALJ said about the opinions of Dr. Kelly:

> The undersigned affords little weight to the opinions of Dr. John Kelly (Exhibits 9F; 14F). While he is a treating source of the claimant, Dr. Kelly's opinions are not consistent with the record as a whole. Dr. Kelly's opinion as to the claimant' physical limitations include a number of extreme limitations that are not supported by the record, including a complete inability to lift any weight at all off the floor or stoop. Dr. Kelly also rendered an opinion as [to] the claimant's mental limitations, despite that being somewhat outside of his realm of expertise as a primary care provider, but these reported limitations are grossly inconsistent with the record. As previously discussed, the claimant has never treated with a psychiatric expert. Dr. Kelly indicated that the claimant had poor to no ability to demonstrate reliability or behave in an emotionality [sic] stable manner (Exhibit 9F/3). He also indicated that the claimant had extreme loss in her ability to respond appropriately to usual works [sic] situations and make simple work-related decisions, but could still somehow manage her benefits in her own best interest. However, the record indicates the claimant has never needed to be hospitalized for psychiatric reasons, and has never even treated with a psychological expert, making these reported limitations somewhat dubious. The claimant also reports that most of her limitations are physical in nature, not mental (Exhibit 3E). Accordingly, the undersigned finds that Dr. Kelly's opinion is not consistent with the record and affords it little weight.

[AR at 27.]

"While a treating physician's opinion is usually entitled to controlling weight, it must be 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and not contradicted by other substantial evidence." *Lloyd v. Berryhill*, 682 Fed.Appx. 491, 496 (7th Cir. 2017), citing 20 C.F.R. §404.1527(c)(2). If an ALJ chooses to reject a treating physician's opinion he has to give good reasons for doing so after considering the following factors:

> (1) whether the physician examined the claimant, (2) whether the physician treated the claimant, and if so, the duration of overall treatment and the thoroughness and frequency of examinations, (3) whether other medical evidence supports the physician's opinion, (4) whether the physician's opinion is consistent with the record, and (5) whether the opinion relates to the physician's specialty.

*Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016).

In this case, the ALJ attributed his disregard of Dr. Kelly's opinions to their extreme nature, which the ALJ found to be inconsistent with the medical record. [AR at 27.] Review of the medical record, which consists largely of Dr. Kelly's treatment of Fortenberry, confirms the reasonableness of the ALJ's conclusion, as does a comparison of Dr. Kelly's opinions with Fortenberry's own reports of her abilities.

Dr. Kelly treated Fortenberry regularly from July 2008 through her Social Security proceedings. [AR at 281, 431.] A log of Activities of Daily Living reflects Fortenberry's report that her limitations are "caused by her physical impairments, not mental conditions," and that she is able to cook, clean and shop with some physical limitations, that she gets along well with others and is able to focus on conversations

5

and TV shows, to follow written and verbal instructions and to recall personal and general information. [AR at 284.] At her hearing before the ALJ, Fortenberry agreed that her limitations are more physical than mental. [AR at 73.]

Fortenberry's hearing testimony suggested that she quit her last job as a waitress at Ryan's Steakhouse because she was irritated that the restaurant was understaffed that day. Fortenberry told the ALJ that she "walked out of [the] job" when a fellow server did not show up for work, and Fortenberry became overwhelmed with the workload. [AR at 61.] Fortenberry made no reference to back or neck pain as disabling her from her work. It had more to do with the stress of the situation. Her testimony was otherwise unremarkable. She confirmed that she gets along well with people, is able to focus on TV shows and conversations, and is able to handle her finances. [AR at 81.] Fortenberry testified that she sweeps, does dishes, makes her bed and goes with her boyfriend to the laundromat every two weeks. [AR at 82-83.] She testified that she is able to drive to the grocery store and shop alone for 30 minutes, pushing the cart, and unload the groceries from the car at home if the bags weigh no more than 5 pounds each. [AR at 77-79.] The ALJ's opinion takes all these factors into account. [AR at 23, 24, 25, 26.]

Beginning as early as 2011, Dr. Kelly prescribed hydrocodone-acetaminophen for unspecified myalgia (muscle pain) and myositis (muscle inflammation). [AR at 518.] Fortenberry was seeing Dr. Kelly regularly. For example, on March 27, 2012, Fortenberry visited Dr. Kelly. The stated purpose of the appointment was for

6

Fortenberry to get her "meds refilled." [AR at 345.] Fortenberry told Dr. Kelly that her "pain is constant, (100%) of the time" though it could be controlled by medication. [AR at 346.] In response, Dr. Kelly planned a radiology work-up of the lumbar sacral spine and blood work in relation to Fortenberry's reported back pain. [AR at 510.] The radiology work was done the next day and the results were entirely normal. [AR at 345.]

In early 2013 Dr. Kelly decided to refer Fortenberry to a pain specialist for pain management relating to her cervical spine. [AR at 350, 352.] Nurse Practitioner Jennifa Thomas treated Fortenberry at the Woodland Pain Center on referral from Dr. Kelly, beginning in March 2013. [AR at 282.] Thomas quickly became concerned that Fortenberry was getting addicted to the opiods. The records show that Thomas repeatedly discussed opioid addiction with Fortenberry, advising that she taper off all opioids in March 2013, April 2013, July 2013, October 2013 and January 2014. [AR at 587, 597, 608, 617, 627.]

Fortenberry's February 14, 2013 visit to Dr. Kelly reflects Fortenberry's first assertion of an inability to work due to pain in her back. [AR at 329.] Dr. Kelly responded to Fortenberry's complaints of pain with the prescription of the same four medicines he had previously prescribed. [AR at 332.] On her July 18, 2013 visit to Dr. Kelly, Fortenberry reported just about every species of pain (generalized, headache, neck pain, abdominal pain, lower back pain and limb pain), and that they were not controlled since her last visit. [AR at 391.] Reporting constant pain in her neck, lower

7

back and limbs during her November 27, 2013 visit, Fortenberry also advised Dr. Kelly's office that she could not afford her hydrocodone. [AR at 458.]

An MRI of Fortenberry's lumbar spine on April 5, 2014 revealed a small disc herniation at the L4-L5 level with mild left neural foraminal narrowing, but no other significant degenerative changes, no fracture, and no subluxation (partial dislocation). [AR at 344.] A February 13, 2015 MRI of Fortenberry's cervical spine showed it to be normal in every way except for a mild compression of a spinal nerve at C4-C5. [AR at 575.] The treatment notes of Fortenberry's January 28, 2015 visit to Dr. Kelly don't reference pain, but instead focus on restless legs syndrome and sleep disturbances. [AR at 428-432.]

The three radiologic tests of the lumbar and cervical spine over a three-year period show either no or only mild degenerative changes. The ALJ noted that the MRI's of Fortenberry's spine "have not suggested disabling abnormalities." [AR at 26.] Dr. Kelly's records variously associate the reported pain with arthritis, spondylosis, chronic pain, cervicalgia and unspecified "thoracic or lumbosacral neuritis or radiculitis" as well as unspecified myalgia and myositis, with occasional mentions of fibromyalgia [e.g., AR at 470]. These various conditions seldom feature in the "PLAN" section of Dr. Kelly's notes on each visit, suggesting he offered as little in the way of treatment as he did in the way of specific diagnosis. The ALJ notes that despite Fortenberry's reports of constant pain, the record indicates that she does not appear to be in acute distress,

8

has "engaged in rather limited treatment," "has not attempted surgery," and "is not even fully compliant with her current, conservative treatment." [AR at 26.]

The ALJ also gave short shrift to Dr. Kelly's opinions about Fortenberry's mental limitations. The ALJ's explanation is four-fold: the subject of mental limitations is "somewhat outside of [Dr. Kelly's] realm of expertise as a primary care provider," the reported limitations are "grossly inconsistent with the record," Fortenberry has never treated with a mental health expert, and Fortenberry herself describes her limitations as physical in nature, not mental. [AR at 27.] The ALJ found unsupported by the record Dr. Kelly's opinion that Fortenberry has little ability to demonstrate reliability or behave in an emotionally stable manner. [*Id*.] The ALJ observed that Kelly's finding that Fortenberry is unable to make simple decisions is incompatible with his opinion that Fortenberry is nonetheless capable of managing her benefits in her own interest. [*Id*.] Consideration of the doctor's specialty and consistency with the record are appropriate factors for the ALJ's weighing of a treating physician's opinions. *Brown*, 845 F.3d at 252. Fortenberry's argument fails to demonstrate that the ALJ offered an inadequate or erroneous explanation of his reasons for giving Dr. Kelly's mental health opinions little weight.

For all these reasons, the lack of objective medical evidence and overall inconsistency with the record support the ALJ's refusal to give Dr. Kelly's extreme opinions about Fortenberry's limitations considerable weight. And those factors are adequately explained by the ALJ in his decision. These factors constitute "good

9

reasons" for the weight the ALJ assigned Dr. Kelly as a medical source. 20 C.F.R. §404.1527(c)(2). Fortenberry's argument essentially asks me to second-guess the ALJ and re-weigh the persuasiveness of Dr. Kelly's assertions about her limitations against certain aspects of the medical record. [DE 13 at 16-18.] But that is not my role on appeal. As noted above, the review is deferential. "Though the ALJ must provide some explanation for her decision to discount a treating physician's opinion, our review is deferential: the ALJ's decision must stand as long as she has 'minimally articulated' her reasons for rejecting the treating doctor's opinion." *Henke v. Astrue*, 498 Fed.Appx. 636, 639 (7th Cir. 2012), quoting *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). Fortenberry fails to demonstrate reversible error in the ALJ's analysis of Dr. Kelly's views.

Fortenberry also argues that the ALJ "inadequately evaluated" the opinion of consultative examiner Dr. Bharat Pithadia. [DE 13 at 14.] Specifically, Fortenberry cites Dr. Pithadia's conclusion that Fortenberry suffered from significant carpal tunnel syndrome, which would cause difficulty with activities requiring grip strength. [DE 13 at 19, citing AR at 387.] The ALJ did in fact find that carpal tunnel syndrome is one of Fortenberry's severe impairments. [AR at 22.] Citing Dr. Pithadia's report, the ALJ noted that although Fortenberry's "grip strength was somewhat reduced, her fine movement, reflexes and sensory examination was normal." [AR at 22-23, citing AR at 386-387.] In his more detailed review of the medical record, the ALJ analyzed Fortenberry's carpal tunnel syndrome and concluded that it was not disabling. [AR at 26.] The ALJ noted Dr. Pithadia's findings but also that Fortenberry has had little

treatment for the condition, had not undergone surgery, and that the medical record reflects normal fingers and fine movements as well as full muscle strength in her extremities. [*Id.*] Fortenberry's assertion that the ALJ did not discuss Dr. Pithadia's report about carpal tunnel syndrome is false, and Fortenberry fails to demonstrate any reversible error in the ALJ's consideration of Dr. Pithadia's evidence.

## 2. **Evaluation of Impairments and Limitations**

Fortenberry next argues that the ALJ failed to identify all of her medically determinable severe impairments and failed to account for their combined limiting effects. [DE 13 at 20.] More specifically, Fortenberry asserts that it was error for the ALJ to include carpal tunnel syndrome among her severe impairments, but not to have included any manipulative limitations in her residual functional capacity. [*Id.*] "When determining an individual's RFC, the ALJ must consider all limitations that arise from medically determinable impairments." *Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014).

As I've already noted, the ALJ clearly considered Dr. Pithadia's observations about indications of carpal tunnel syndrome. He expressly referenced them in his RFC discussion, noting the finding of decreased grip strength and thinning of the thenar eminence on the left side. [AR at 26, citing AR at 387.] The impact of the impairment was on the ALJ's mind, as he questioned the vocational expert about the effect on job prospects if the ability to perform handling and fingering was reduced to merely occasional. [AR at 101.] But his analysis was ultimately that the medical records did

11

not support a finding that Fortenberry's condition was disabling. His reasons included that Fortenberry had sought little treatment for carpal tunnel and had not had surgery, which Dr. Pithadia observed would help if her condition impacted "clutching and squeezing." [AR at 387.] The ALJ also noted that other medical examinations found that Fortenberry's fingers and fine movements were normal, and repeatedly (four times) observed that she had full muscle strength in all her extremities. [AR at 26, citing AR 386, 586, 596, 616 and 377.] For Fortenberry to suggest that the ALJ failed to specifically discuss why he did not include manipulative limitations in the RFC is disingenuous. [AR 13 at 21.] He clearly did. And Fortenberry's argument establishes no reversible error by the ALJ in doing so.

Next Fortenberry challenges the adequacy of the ALJ's RFC assessment of her limitations "in performing the mental demands of work." [AR 13 at 21.] Acknowledging that the ALJ found Fortenberry's severe impairments to include depression and anxiety [AR at 22], and that she has moderate limitations in maintaining concentration, persistence or pace [AR at 23], Fortenberry suggests that the ALJ's RFC did not adequately take these difficulties into account. [AR 13 at 21-22.] Noting these issues, the ALJ's RFC assessment included that Fortenberry is "limited to simple, routine, repetitive tasks and simple work related decisions" and "can only tolerate a few changes in a routine work setting." [AR at 24.] The RFC also limits Fortenberry "to occasional interaction with the public, coworkers, and supervisors." [*Id.*]

In pressing this argument, Fortenberry relies on and analogizes from cases in which the Seventh Circuit has been critical of the hypothetical posed to the vocational expert as inadequately setting forth deficiencies of concentration, persistence and pace, such as *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). Fortenberry does not specifically articulate why the ALJ's RFC formulation in this case was inadequate to capture the work-related limitations associated with Fortenberry's depression, anxiety and maintaining concentration, persistence or pace. Neither does Fortenberry cite to a case that demonstrates the insufficiency of the kind of language the ALJ used here. Fortenberry has the burden to demonstrate a reversible error in the Commissioner's adverse decision. That burden is not met by citing an issue identified in other cases and then merely asserting, without demonstrating, that an analogous error is present in her case. Without more, Fortenberry's argument on this point is unpersuasive and unavailing.

Next, Fortenberry argues that the RFC assessment should have reflected "that Ms. Fortenberry's depression, anxiety, and pain combine to make her irritable and unpredictable in a work setting." [DE 13 at 22.] In making this argument, Fortenberry cites no factual evidence of issues with irritability or unpredictable behavior. This conclusion about Fortenberry is said to be supported by "Dr. Kelly's assessment," but curiously, the citation in her brief is to *Dr. Pithadia's* report. [DE 13 at 22, citing AR at 387.] What's more, the cited report from Dr. Pithdia suggests the contrary: Fortenberry

13

displayed a normal affect and no abnormalities of personality or psychosis, according to Dr. Pithadia. [AR at 387.]

For his part, Dr. Kelly assessed Fortenberry's mental issues as "fair" in her ability to relate predictably in social situations [AR at 419] and there was no assessment specifically relating to irritability. And there was substantial evidence to the contrary. As the ALJ noted several times, and as Fortenberry herself reported, she was able to get along with others. [AR at 23, 26, 81 and 284.] In any event, the ALJ's RFC assessment included limited social interactions with the public, coworkers and supervisors [AR at 24], and Fortenberry does not demonstrate (or even attempt to demonstrate) that this finding is insufficient to address the limitations Fortenberry invokes.

Fortenberry also criticizes the ALJ's consideration of her fibromyalgia. [DE 13 at 23.] In fact, the ALJ identified fibromyalgia as a non-severe impairment, but noted that the record "does not contain clinical or diagnostic findings, nor durational treatment, to support the severity of this impairment." [AR at 22.] Fortenberry does not challenge the accuracy of that comment or the rest of the substance of the ALJ's discussion of her fibromyalgia. In sum, the ALJ found that because he was already assessing three other severe impairments — degenerative disc disease, carpal tunnel syndrome and depression — which "could reasonably cause the claimant's symptoms of widespread body pain and fatigue," he "considered the claimant's reported symptoms, but attributed them to the claimant's other impairments." [*Id.*]

Fortenberry does not identify a specific shortcoming of what the ALJ *did* with respect to his analysis of fibromyalgia, but only criticizes what he *didn't* do, without any authority suggesting that any of those steps were required.  For example, Fortenberry faults the ALJ for not *mentioning* SSR 12-2p, a Social Security Administration Policy Interpretation Ruling addressing evaluation of fibromyalgia.  Fortenberry does not identify any requirement of SSR 12-2p that was not met by the ALJ's analysis, or any other respect in which SSR 12-2p demonstrates that reversible error was committed in her case.  Much of SSR 12-2p is devoted to determination of whether fibromyalgia *is* a medically determinable impairment, but obviously the ALJ here found that it was.  To the extent the remainder of SSR 12-2p addresses how fibromyalgia (once determined) is evaluated, Fortenberry does not explain how that policy guidance was not followed by the ALJ who evaluated her case.

In evaluating Fortenberry's claims about her symptoms and functional limitations, the ALJ considered "all of the evidence in the case record, including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements made by other people about symptoms," and ultimately applied the familiar 5-step sequential evaluation process, as SSR 12-2p prescribes.  [*Id*.]  Fortenberry cites no authority explaining any necessity for obtaining information from nonmedical sources or third party function reports in order

to appropriately assess her fibromyalgia. [DE 13 at 23.] No reversible error is demonstrated in the ALJ's fibromyalgia analysis.

Next Fortenberry argues that the ALJ:

> erred by failing to adequately consider Ms. Fortenberry's diagnoses of osteoarthritis/arthropathy, obesity, hypothyroidism, chronic pain syndrome, migraine/headaches, and peripheral vascular disease...and clumping together Ms. Fortenberry's spinal conditions as "degenerative disc disease" without recognizing the distinct symptoms and limitations caused [by] cervical radiculitis, cervical degenerative disc disease, thoracic/lumbar radiculitis, and lumbar degenerative disc disease.

[DE 13 at 23.] This argument is best described as a cast-the-net-and-see-what-we catch argument by Fortenberry. The ALJ clearly reviewed the entire medical record, including the lengthy and various lists of "Active Problems" featured in Dr. Kelly's treatment notes. [*See, e.g.,* AR at 311.] Although Fortenberry refers to "distinct symptoms and limitations caused" by variously described spinal conditions, she does not explain any such distinctions or cite to any evidence in the medical record supporting such distinctions or their significance.

To the extent Fortenberry specifically singles out obesity, the Commissioner rightly points out that Fortenberry merely invokes the condition without arguing that she had any limitations from her obesity and without citing to "any objective or opinion evidence that her obesity would have exacerbated her symptoms." [DE 19 at 12.] *Hernandez v. Astrue*, 277 Fed.Appx. 617, 624 (7th Cir. 2008) (it is the claimant's burden to "articulate how her obesity exacerbated her underlying conditions and further limited her functioning"). Because of that silence, and because the ALJ "demonstrated that he

reviewed the medical reports of the doctors familiar with the claimant's obesity," any failure to explicitly address obesity is harmless error. *Id.*, citing *Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006). The Court of Appeals has "long held that an ALJ is not required to provide a 'complete written evaluation of every piece of testimony and evidence.'" *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004), quoting *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995). I find that the ALJ's determination of Fortenberry's impairments, their severity and her RFC was supported by substantial evidence. Fortenberry's scattershot argument does not demonstrate otherwise.

Finally, Fortenberry argues that the ALJ did not properly address the issue of sustainability, that is, whether Fortenberry's limitations prevent her from "sustaining a 40-hour workweek." [DE 13 at 24.] Without citing to particular evidence, medical or otherwise, Fortenberry summarily argues that "the weight of the evidence" shows that, even if she could perform a number of functions, Fortenberry could not sustain those activities as required for a 40-hour workweek. This degree of generality in making the argument robs it of persuasive force. Furthermore, the Seventh Circuit has repeatedly held that a perfunctory and undeveloped argument is waived. *Putnam v. Colvin*, 651 Fed.Appx. 538, 542-43 (7th Cir. 2016); *Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013); *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001); *United States v. Andreas*, 150 F.3d 766, 769 (7th Cir. 1998).

17

**Conclusion**

In reviewing the ALJ's decision, I "may not decide facts anew or make independent credibility determinations, and must affirm the ALJ's decision even if reasonable minds could differ about the ultimate disability finding." *Brown v. Colvin*, 845 F.3d 247, 251 (7th Cir. 2016). For the reasons I've explained, Fortenberry has not demonstrated that the ALJ failed to build a logical bridge from the evidence to his conclusion that Fortenberry is not disabled, or committed other reversible error.

**ACCORDINGLY:**

The final decision of the Commissioner of Social Security denying plaintiff Jenny Fortenberry's application for disability benefits is AFFIRMED.

The Clerk shall enter judgment in favor of defendant Commissioner and against plaintiff Fortenberry.

**SO ORDERED**.

ENTERED: November 14, 2017

/s/ Philip P. Simon
**UNITED STATES DISTRICT JUDGE**